# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JARROD STRINGER, BENJAMIN HERNANDEZ, and JOHN WOODS,
*Plaintiffs-Appellees*,

v.

ROLANDO PABLOS, in his official capacity as the Texas Secretary of State, and STEVEN C. McCRAW, in his official capacity as the Director of the Texas Department of Public Safety,
*Defendants-Appellants*,

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## BRIEF OF PLAINTIFFS-APPELLEES JARROD STRINGER, BENJAMIN HERNANDEZ, AND JOHN WOODS

Peter A. Kraus
Charles S. Siegel
Caitlyn E. Silhan
Rachel A. Gross
WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-871-2263 (Facsimile)

Mimi M.D. Marziani
Rebecca Harrison Stevens
Hani Mirza
Ryan V. Cox
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

No. 18-50428

JARROD STRINGER, BENJAMIN HERNANDEZ, and JOHN WOODS,
*Plaintiffs-Appellees*,

v.

ROLANDO PABLOS, in his official capacity as the Texas Secretary of State, and
STEVEN C. McCRAW, in his official capacity as the Director of the Texas
Department of Public Safety,
*Defendants-Appellants*,

Pursuant to 5TH CIR. R. 27.4, the undersigned counsel of record certifies that
the following listed persons and entities, as described in the fourth sentence of 5TH
CIR. R. 28.2.1, have an interest in the outcome of this case. These representations
are made in order that the judges of this court may evaluate possible disqualification
or recusal.

1. Rolando Pablos, *in his official capacity as Texas Secretary of State*

2. Steven C. McCraw, *in his official capacity as Director of the Texas
   Department of Public Safety*

3. Ken Paxton, Counsel for Defendants-Appellants

4. Jeffrey C. Mateer, Counsel for Defendants-Appellants

5. Scott A. Keller, Lead Counsel for Defendants-Appellants

6. Matthew H. Frederick, Counsel for Defendants-Appellants

7. Beth Klusmann, Counsel for Defendants-Appellants

8. Anne Marie Mackin, Counsel for Defendants-Appellants

9. Esteban S.M. Soto, Counsel for Defendants-Appellants

10. Jarrod Stringer, Plaintiff-Appellee

11. Benjamin Hernandez, Plaintiff-Appellee

12. Dr. John O. Woods III, Plaintiff-Appellee

13. Peter A. Kraus, Counsel for Plaintiffs-Appellees

14. Charles S. Siegel, Counsel for Plaintiffs-Appellees

15. Caitlyn E. Silhan, Counsel for Plaintiffs-Appellees

16. Rachel A. Gross, Counsel for Plaintiffs-Appellees

17. Mimi M.D. Marziani, Counsel for Plaintiffs-Appellees

18. Rebecca Harrison Stevens, Counsel for Plaintiffs-Appellees

19. Hani Mirza, Counsel for Plaintiffs-Appellees

20. Ryan V. Cox, Counsel for Plaintiffs-Appellees

Respectfully submitted this 31st Day of August, 2018.

/s/ Charles S. Siegel
Charles S. Siegel
Attorney for Plaintiffs-Appellees

**STATEMENT REGARDING ORAL ARGUMENT**

Appellees Jarrod Stringer, Benjamin Hernandez, and John Woods respectfully request oral argument in order to aid in a full and complete consideration of the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS.......................................................................................iv

TABLE OF AUTHORITIES ................................................................. vii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE...............................................................................1

    I.     PLAINTIFFS.................................................................................1

    II.    PROCEDURAL HISTORY .........................................................3

    III.   VOTER REGISTRATION PROCESS IN PERSON AND BY
          MAIL.........................................................................................4

    IV.   DEFENDANTS REFUSE TO TREAT ONLINE DRIVER'S
          LICENSE APPLICATIONS AS VOTER REGISTRATION
          APPLICATIONS.........................................................................5

    V.    DEFENDANTS REQUIRE DUPLICATIVE INFORMATION ON
          ONLINE DRIVER'S LICENSE APPLICATIONS AND SEPARATE
          VOTER REGISTRATION APPLICATIONS.....................................7

    VI.   SIGNATURE USED FOR VOTER REGISTRATION ......................8

SUMMARY OF THE ARGUMENT ......................................................9

ARGUMENT ......................................................................................11

    I.     PLAINTIFFS ESTABLISHED STANDING .....................................11

          A.    Plaintiffs Not Only Suffered Disenfranchisement in the Past,
                but Also Continue to Suffer an Ongoing Violation of Their
                Statutory Right to Simultaneous Voter Registration ...............11

B.    Plaintiffs Established Standing to Seek Prospective Injunctive Relief .......................................................................................16

C.    In the alternative, the "Capable-of-Repetition-Yet-Evading-Review" Exception Applies .....................................................21

    1.    Plaintiffs Could Not Have Fully Litigated Their Claims Prior to Becoming Registered.........................................21

    2.    There Is a Reasonable Expectation that Plaintiffs or Others Will Again Be Aggrieved by the State's Failure to Register or Update Their Registration During Their Next Online Driver's License Transaction.............................24

II.    THE DISTRICT COURT PROPERLY HELD THAT DEFENDANTS' FAILURE TO TREAT ONLINE DPS APPLICATIONS AS VOTER REGISTRATION APPLICATIONS VIOLATES THE NVRA .................................................................25

    A.    Defendants Were on Notice of Facts Actionable Under Section 20504(a) .......................................................................25

    B.    DPS's Combined Online Driver's License Application Fails to Offer a Simultaneous Application for Voter Registration, in Violation of Sections 20503(a)(1) and 20504(a) ....................28

    1.    The NVRA Does Not Require Physical, Handwritten Signatures on Paper .......................................................28

    2.    The NVRA Does Not Permit Texas to Use Separate, Non-Simultaneous Voter Registration Forms in Connection with Driver's License Transactions ............29

    C.    Defendants' Failure to Treat Online Driver's License Change-of-Address Applications as Notifications of Changes of Address for Voter Registration Violates Section 20504(d)......30

    D.    The Plain Text of the NVRA Prohibits Defendants from Collecting Duplicative Information from Online Driver's License Applicants Who Wish to Register to Vote .................33

E.   Defendants Violate the NVRA's Timely Submission and Registration Requirements, §§ 20504(e) and 20507(a)(1)(A)..34

III.   THE DISTRICT COURT PROPERLY FOUND AN EQUAL PROTECTION VIOLATION ............................................................35

A.   The District Court Was Correct to Consider the Equal Protection Claim ...............................................................36

B.   Defendants' Refusal to Treat Online License Renewals and Changes-of-Address as Voter Registration Transactions Violates the Equal Protection Clause.......................................38

IV.   THE INJUNCTION IS APPROPRIATE IN SCOPE TO REMEDY DEFENDANTS' NVRA AND EQUAL PROTECTION VIOLATIONS, TO CURE THEIR EFFECTS, AND TO ENSURE COMPLIANCE ...................................................................................44

A.   The District Court Has Broad Discretion in Crafting Appropriate Injunctive Relief ...............................................45

B.   The Injunction is Narrowly Tailored to Remedy Defendants' Unlawful Conduct and to Ensure Future Compliance ..............47

1.   The Injunction Includes Only Provisions Necessary to Provide "Complete Relief" to the Plaintiffs ...................47

2.   The District Court Was Empowered to Order Remedial Measures Necessary to Fully Remedy Violations of the NVRA and Equal Protection Clause ..............................50

a.   Public Education Campaign .................................50

b.   Specific Compliance Language............................52

c.   Compliance Monitoring and Retained Jurisdiction .........................................................52

CONCLUSION .......................................................................................54

CERTIFICATE OF SERVICE ................................................................56

CERTIFICATE OF COMPLIANCE.......................................................56

**Cases**

*Action NC v. Strach,*
  216 F. Supp. 3d 597 (M.D.N.C. 2016) ............................................ 14, 15, 16, 19,

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) .................................................................... 38, 39, 40, 43, 44

*Arcia v. Florida Sec'y of St.,*
  772 F. 3d 1335 (11th Cir. 2015) ................................. 14, 15, 16, 17 18, 19, 23, 25

*Ass'n of Cmty. Orgs. For Reform Now v. Miller,*
  129 F.3d 833 (6th Cir. 1997) ................................................................................26

*Ass'n. of Cmty. Orgs. for Reform Now v. Fowler,*
  178 F.3d 350 (5th Cir. 1999) ................................................................................11

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar,*
  56 F.3d 791 (7th Cir. 1995) ..................................................................................48

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ........................................................................ 38, 39, 40, 44

*Bush v. Gore,*
  531 U.S. 98, 104 (2000) ........................................................................................35

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ..............................................................................................45

*Celanese Corp. v. Martin K. Eby Constr. Co.,*
  620 F.3d 529 (5th Cir. 2010) ................................................................................31

*Chabad-Lubavitch of Georgia v. Miller*,
   5 F.3d 1383 (11th Cir. 1993) ..............................................47

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005) .................................. 13, 15

*City Council of Los Angeles v. Taxpayers for Vincent*,
   466 U.S. 789 (1984)..........................................................47

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983).................................................... 19, 20

*Crawford v. Marion County Election Bd.*,
   553 U.S. 181 (2008)................................................... 38, 39

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) ............................... 21, 23, 24

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008).........................................................21

*Deutsch v. Annis Enters., Inc.*,
   882 F.3d 169 (5th Cir. 2018) ..........................................20

*Dotson v. City of Indianola, Miss.*,
   739 F.2d 1022 (5th Cir. 1984) ........................................37

*Dunn v. Blumstein*,
   405 U.S. 330 (1972)..........................................................24

*Edelman v. Jordan*,
   415 U.S. 651 (1974)..........................................................11

*Escambia Cty. v. McMillan*,
   466 U.S. 48 (1984)............................................................37

*Granville-Smith v. Granville-Smith*,
  349 U.S. 1 (1955)...............................................................18

*Harper v. Virginia State Bd. of Elections*,
  383 U.S. 663 (1966)...........................................................35

*In re Dale*,
  582 F.3d 568 (5th Cir. 2009) .............................................12

*Jones v. Cain*,
  600 F.3d 527 (5th Cir. 2010) .............................................36

*Kusper v. Pontikes*,
  414 U.S. 51 (1973).............................................................43

*Lion Health Servs. Inc. v. Sebelius*,
  635 F.3d 693 (5th Cir. 2011) .............................................45

*Lynch v. Baxley*,
  744 F.2d 1452 (11th Cir. 1984) .........................................17

*Machete Productions, LLC v. Page*,
  809 F.3d 281 (5th Cir. 2015) .............................................20

*Norman v. Reed*,
  502 U.S. 279 (1992)...........................................................38

*Northeast Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) ...................................... 39, 43

*Northeastern Florida Chapter of Associated Gen. Contractors of Am. v.*
*City of Jacksonville, Fla.*,
  508 U.S. 656 (1993)...........................................................11

*O'Shea v. Littleton,*
   414 U.S. 488 (1974).............................................................................19

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ........................................................ 35, 40

*Professional Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty Cmty.*
*Coll. Dist.,*
   730 F.2d 258 (5th Cir. 1984) ..............................................................45

*Rosario v. Rockefeller,*
   410 U.S. 752 (1973)....................................................................... 21, 23

*Scott v. Schedler,*
   771 F.3d 831 (5th Cir. 2014) ................................................... 11, 26, 46

*Sessions v. Morales-Santana,*
   137 S.Ct. 1678 (2017)..........................................................................46

*Skolnick v. Board of Commissioners,*
   435 F.2d 361 (7th Cir. 1970) ..............................................................18

*SmallBizPros, Inc. v. MacDonald,*
   618 F.3d 458 (5th Cir. 2010) ..............................................................53

*Storer v. Brown,*
   415 U.S. 724 (1974)................................................................... 23, 24, 25

*Susan B. Anthony List v. Driehaus,*
   134 S.Ct. 2334 (2014)..........................................................................16

*Swann v. Charlotte-Mecklenburg Bd. of Ed.,*
   402 U.S. 1 (1971).......................................................................... 45, 46

*Terrebonne v. Blackburn*,
  646 F.2d 997 (5th Cir. 1981) ...............................................................18

*Toj-Culpatan v. Holder*,
  612 F.3d 1088 (9th Cir. 2010) ............................................................18

*United States v. Louisiana*,
  196 F. Supp. 3d 612 (M.D. La. 2016)...................................................53

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016) ...............................................................36

*Veasey v. Abbott*,
  No. 2:13-CV-00193, at Dkt No. 895 (S.D. Tex. Aug. 10, 2016) .........51

*Voting Rights Coal. v. Wilson*,
  60 F.3d 1411 (9th Cir. 1995) ........................................................ 48, 49

*Weinstein v. Bradford*,
  423 U.S. 147 (1975)...............................................................................24

## Statutes

52 U.S.C. § 20501 .....................................................................................1

52 U.S.C. § 20501(b)(1) ...........................................................................23

52 U.S.C. § 20503 ....................................................................................28

52 U.S.C. § 20503(a)(1)................................................................ 35, 47, 50

52 U.S.C. § 20504 ....................................................... 9, 12, 28, 31

52 U.S.C. § 20504(a) .............................. 25, 27, 28, 29, 31, 35, 47, 50, 52

52 U.S.C. § 20504(a)(1) .............................................................. 9, 28, 31

52 U.S.C. § 20510(b) ....................................................................... 11, 12

52 U.S.C. § 20504(c) ............................................................ 30, 35, 47, 50

52 U.S.C. § 20504(c)(1) ............................................................... 47, 50

52 U.S.C. § 20504(c)(2)(A) .................................................. 30, 31, 33, 34

52 U.S.C. § 20504(c)(2)(B) .....................................................................33

52 U.S.C. § 20504(c)(2)(C) ................................................................ 31, 34

52 U.S.C. § 20504(d) .................................... 27, 29, 30, 31, 35, 47, 50, 52

52 U.S.C.§ 20504(e) ................................................................ 34, 47, 50

52 U.S.C. § 20507(a)(1)(A) .....................................................................34

52 U.S.C. § 20510(b) ........................................................... 11, 12, 16

Equal Protection Clause ................................................................ *passim*

1 TEX. ADMIN. CODE § 81.58 ...............................................................43

TEX. BUS. & COM. CODE § 322.007(d) ...................................................42

TEX. BUS. & COM. CODE § 322.017(a)....................................................42

TEX. ELEC. CODE § 20.062(b) ...............................................................33

TEX. ELEC. CODE § 20.066(a)(2)............................................................42

TEX. ELEC. CODE § 20.066(b) ...............................................................42

TEX. ELEC. CODE §§ 13.001–13.002...................................................23

TEX. ELEC. CODE §§ 16.031–16.038...................................................18

TEX. ELEC. CODE §§ 16.091–16.095...................................................18

TEX. ELEC. CODE § 20.066(a)(2)-(3)..................................................43

TEX. ELEC. CODE § 65.056(a) ..........................................................22

TEX. GOV'T CODE § 2054.060(a) ......................................................42

TEX. GOV'T CODE § 2054.271(b) ......................................................42

TEX. TRANSP. CODE § 521.054..........................................................17

TEX. TRANSP. CODE § 521.271(b)(1) .................................................17

**Rules**

FED. R. CIV. P. 65 ..........................................................................46

Federal Rule of Evidence 201 ...........................................................18

1.  Does the subsequent voter registration of persons aggrieved by Defendants' non-compliance with the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and prevented from voting, moot their claims for injunctive relief?

2.  If Plaintiffs' claims were rendered moot, are their claims nonetheless subject to the "capable of repetition, yet evading review" exception to mootness?

3.  Did the district court err in finding that Defendants violated the NVRA by failing to provide simultaneous voter registration applications with online drivers' license transactions?

4.  Did the district court err in determining that Defendants' NVRA violations also violated the Equal Protection Clause?

5.  Did the district court abuse its wide discretion to shape equitable remedies by entering an injunction requiring NVRA compliance monitoring and reporting and an education campaign, and retaining jurisdiction to enforce the injunction?

## STATEMENT OF THE CASE

Between September 2013 and February 2015, the State recorded over 1,800 complaints regarding its failure to register individuals to vote through Defendant Department of Public Safety's ("DPS")'s online driver license renewal and change-of-address system. Plaintiffs were among those who believed that, as mandated by the NVRA, they had registered to vote at their new address when they updated their information through DPS's online system, but they were turned away at the polls.

## I. PLAINTIFFS

Jarrod Stringer has moved twice since 2004, including in August 2014 when he moved to Bexar County. ROA.2957. After moving, he used DPS's online system to update his driver's license address and checked "yes" in response to the question asking whether he wanted to register to vote. ROA. 2954, 2957-59. When Stringer attempted to vote in November 2014, he was informed that he was not properly registered to vote in the federal election and was, instead, only eligible to vote a statewide ballot. ROA.2955-56, 2960-62. Stringer "plan[s] to continue transacting online with [DPS] in the future whenever [he is] required to renew or change the address on [his] driver's license and [he is] eligible to do so." ROA.2736-38.

Benjamin Hernandez moved from Ector County to Dallas County in February 2013. ROA. 2933, 2945. Thereafter, he used DPS's online system to update his driver's license address and checked "yes" to the voter registration question, and believed he had updated his voter registration simultaneously. ROA.2931, 2933-35, 2945. On Election Day 2014, Hernandez went to his polling location and was informed that he was not on the voter rolls; he cast a provisional ballot, later receiving notice that his vote was not counted. ROA.1604, 2937-40.

Dr. John O. Woods III moved from Travis County to Harris County in June 2015. ROA.2983. In September 2015, he used DPS's online system to change his driver's license address and checked "yes" to the voter registration question. ROA.2322, 2974, 2977-78. On Election Day 2015, Woods called Harris County to

confirm his polling location. He was informed that he was not registered to vote in Harris County, but could cast a provisional ballot that would likely not be counted. ROA.2985-86. Plaintiff Woods nevertheless went to his polling location and cast a provisional ballot. He later received notice that his vote was not counted. ROA.2987-88.

## II.   PROCEDURAL HISTORY

Between May and November 2015, Plaintiffs notified Defendants several times about Plaintiffs' claims regarding violations of the NVRA and Equal Protection Clause. ROA.1560-62, 2221-36, 2242-43, 2245-46, 2911. Defendants did not make the changes necessary to correct the violations at issue prior to Plaintiffs filing suit, on March 14, 2016, nearly four months after the last notice letter. ROA.22-40. Defendants filed a motion to dismiss, which was denied by the district court on March 31, 2017.  ROA.1554-74.

On April 3, 2018, the district court granted Plaintiffs' motion for summary judgment in full and denied Defendants' competing motion for summary judgment. ROA.3248. On May 10, 2018, the court issued an order setting forth detailed findings of fact and conclusions of law. ROA. 3311. Despite the district court's order to do so, Defendants refused to submit their own proposed judgment. ROA.3310-11, 3334-42, .  On May 18, after Defendants ignored the court's order to submit their proposed language, the court issued its judgment.  ROA. 3352-58.

Defendants noticed their appeal on May 21, 2018 and filed a motion to stay with this Court on May 25. ROA.3359-60. This Court granted Defendants' motion to stay on May 31.

## III.    VOTER REGISTRATION PROCESS IN PERSON AND BY MAIL

When a Texan transacts with DPS in person for a new driver's license application, a license renewal, or a change of address, the driver's license and voter registration processes are combined into one seamless transaction. On each form, the in-person applicant is asked: "If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?" ROA.2269-70, 2272-73. The applicant's information is entered by DPS employees into the "Driver License System" ("DLS"). When the in-person applicant checks "Yes" in response to the voter registration question, DPS transmits all information required for voter registration, including the applicant's electronic signature[1], to the Secretary of State ("SOS")'s office every evening. SOS then transmits that information to local voter registrars, who use the data to populate voter registration forms and complete the voter registration process. ROA.2261-63, 3126-27, 2317. The process for mail-in transactions is almost identical, except the electronic signature used by DPS and SOS for these transactions is one captured during the applicant's previous in-person

_____

[1] This is a physical signature electronically captured in a DPS office, and is referred to as an "electronic signature" on driver's license forms DL-14A and DL-43. *See* ROA.2912.

transaction with DPS. ROA.3065, 3126-27, 2317. Notably, election officials never possess the applicant's original, handwritten signature; instead, the voter registration process stemming from all DPS transactions exclusively uses electronic signatures.

## IV. DEFENDANTS REFUSE TO TREAT ONLINE DRIVER'S LICENSE APPLICATIONS AS VOTER REGISTRATION APPLICATIONS

Most Texas driver's license holders, and only U.S. citizens, can utilize DPS's online system to update their driver's licenses. ROA.2911. Annually, nearly 1.5 million Texans update their driver's licenses online. ROA.3130. That number continues to increase, as DPS actively encourages the use of its online system. ROA.2276, 3133. Whether an applicant is renewing their license, changing their address, or doing both, the online system is the same. Br. at 8.

Between April 2013 and February 26, 2016 (shortly before Plaintiffs filed suit), when an applicant reached Step 5 of the DPS online process, he had the option of selecting "yes" or "no" in response to the statement, "I want to register to vote."[2] ROA.2911, 2337. Since February 2016, when an applicant reaches Step 5, he has the option of selecting "yes" or "no" in response to a modified question, "Do you want to request a voter application? You will receive a link to a voter application on

---

[2] The "yes" selection was accompanied by a parenthetical disclaimer, providing: "This does not register you to vote." ROA.2337, 2911. When the "?" icon was selected on this question, DPS's online Driver License Renewal and Change of Address system stated that selecting "yes" would provide a "link to the Secretary of State's voter registration website on your receipt page." *Id*. The receipt page prior to February 2016 included a link labeled "Request Voter Registration Application." ROA.2352, 2343.

your receipt page." ROA.2343, 2362.  The "Yes" selection is again accompanied by a parenthetical disclaimer and the receipt page clarifies: "You are not registered to vote until you have filled out the online application, printed it, and mailed it to your local County Voter Registrar. Click here to Download a Voter Registration Application." ROA.2362-65. This link does not, in fact, lead an applicant to a voter registration application.  Instead, it takes the applicant to the Secretary of State's website, where he must navigate additional links to access an application that he must download, complete, print, and mail or deliver to election officials in order to be registered to vote. ROA.2354, 2365-66, 3122-24.

Unlike in-person and mail-in transactions, when an online applicant checks "yes" in response to the voter registration question, DPS does not transmit his voter registration information and signature to SOS. ROA.2343, 3135.[3]  DPS does not even record the applicant's response to the voter registration question.  ROA.3383-84.  Accordingly, Texas does not provide simultaneous voter registration applications with online  driver's license transactions, even though it concedes that it is able to do so. ROA.3067-68, 3267-68.

---

[3] DPS transmits a file to SOS each evening containing voter registration information, including the electronic signature for each applicant who applied in person at a DPS office or who changed their driver's license address through the mail. ROA.3126-27.  But DPS only sends voter registration information to SOS from applicants who transacted with DPS in person or by mail. *Id.;* ROA.2285-86.

## V. DEFENDANTS REQUIRE DUPLICATIVE INFORMATION ON ONLINE DRIVER'S LICENSE APPLICATIONS AND SEPARATE VOTER REGISTRATION APPLICATIONS

Individuals who update their driver's license information through DPS's online system are only registered to vote or allowed to update their voter registration if they complete an entirely separate transaction with a separate agency, SOS. That transaction requires them to download, complete, and mail or deliver a separate application, which requires them to provide information duplicative of the information they already provided DPS during their driver's license transaction. ROA.2349, 2354, 3139.

An applicant completing an online transaction to renew his Texas driver's license must enter his license number, date of birth, the last four digits of his social security number, and the audit number on his license. ROA.2911. An applicant completing an online transaction to change the address on his driver's license—or an applicant who changes the address on his license when renewing it online—must enter the same information, as well as his home address and, if different, his mailing address. ROA.2911.

Applicants completing an online driver's license transaction who select "Yes" in response to the voter registration question are directed to a link to a separate voter registration application on the SOS's website. That application again requires the license number or personal ID number issued by DPS or, if they have no driver's

license or personal ID number then the last four digits of their social security number; date of birth; residential address and, if different than their residential address, their mailing address. ROA..2315, 2354.

## VI.   SIGNATURE USED FOR VOTER REGISTRATION

For both in-person and mail-in DPS applications, Texas uses the applicant's electronic signature—not the handwritten signature—for voter registration purposes. ROA. 2272-73, 3065. For mail-in forms, for example, even though an individual who indicates he wishes to register on a mail-in change-of-address form provides DPS with a written signature on that form, the signature that DPS then sends to SOS for voter registration—and that county election officials use to generate a voter registration application—is the previously-provided electronic signature collected during the most recent in-person transaction. ROA.3026, 3065. The written signature on the mail-in form is never saved, used, or compared for any purpose by DPS, SOS, or county election officials, unless at some later point fraud or identity theft is suspected to have already taken place. ROA.2258, 2298-99, 2306-07.[4]

And, as SOS testified, it is the signature on the voter registration application— that is, the electronic signature transmitted by DPS to SOS, and then by SOS to the

---

[4] As the district court noted, Defendants admit that online driver's license transactions are subject to equal or even more rigorous authentication requirements than in-person and mail transactions. ROA.3270-71.

counties—that is used for comparison against a voter's signature on absentee ballots, not the written signature on the voter's paper DPS forms. ROA.2522-24; *contra* Br. at 31. Put simply, Texas uses the electronic signatures for voter registrations and verifications made in connection with a DPS transaction.

**SUMMARY OF THE ARGUMENT**

As Defendants put it, "[t]he key facts of this case are not disputed." ROA.723. When eligible Texans renew or update their driver's licenses online with DPS, they are not offered a simultaneous application to register to vote or update their voter registration information. This violates the NVRA, which mandates that each driver's license application, including any renewal application, simultaneously serve as an application for voter registration, and that each driver's license change-of-address form be used to update the voter's registration records, unless the applicant opts out.

The State does not claim that NVRA compliance would be too expensive or burdensome. Instead, Texas contorts the plain language of the law to justify its current processes. According to the Defendants, even though the NVRA mandates "simultaneous application for voter registration" by requiring that "each . . . driver's license application . . . serve as an application for voter registration," 52 U.S.C. § 20504(a)(1), what it means is something else entirely. The State asserts that it must offer nothing more than a simultaneous *opportunity* to register to vote during an online driver's license transaction, which it claims can be satisfied by forcing online

9

DPS applicants to retrieve, print, complete, and mail an entirely separate and duplicative voter registration application to a separate state agency after finishing their online transaction. The district court correctly rejected that reading of the NVRA, holding that the law clearly prohibits Texas's procedure because the NVRA requires not only "that the applications be simultaneous, but discusses them in terms of a single transaction." ROA.3293. Accordingly, Texas's refusal to treat online driver's license renewal and change-of-address applications as voter registration applications violates the NVRA and Equal Protection Clause.

The fact that the Plaintiffs were ultimately registered to vote after they were turned away is of no consequence. Plaintiffs' registration was set in motion simultaneously with their casting of a provisional ballot, meaning that if such registration mooted standing under the NVRA, Plaintiffs would both learn of their injury, and have their right to redress that injury *immediately extinguished,* when they were refused a regular ballot on Election Day. This theory is illogical and contrary to the intent of the NVRA, and has been rejected by every court to consider it. Moreover, even if these claims would otherwise be rendered moot, they would clearly be "capable of repetition yet evading review." Defendants' standing arguments should be rejected, and the district court's judgment affirmed.

**ARGUMENT**

# I.     PLAINTIFFS ESTABLISHED STANDING

To establish Article III standing, each plaintiff must demonstrate "that he or she has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (internal quotation marks and citation omitted). Congress specifically intended to extend standing under the NVRA "to the maximum allowable under the Constitution."[5] *Ass'n. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).  For the reasons that follow, the district court properly held that Section 20510(b) grants Plaintiffs standing to bring a suit for declaratory and/or injunctive relief with respect to Defendants' ongoing violations. ROA.3277-87.

## A. Plaintiffs Not Only Suffered Disenfranchisement in the Past, but Also Continue to Suffer an Ongoing Violation of Their Statutory Right to Simultaneous Voter Registration

Defendants' NVRA violation is two-fold. In addition to the initial denial of their statutory right to simultaneous voter registration and subsequent

---

[5] Defendants do not directly claim that Plaintiffs lack standing to bring their Equal Protection claims. Instead, Defendants state that "sovereign immunity bars Plaintiffs from seeking anything other than prospective injunctive relief against State officials for alleged violations of . . . the Equal Protection Clause."  Br. at 20 (citing *Edelman v. Jordan*, 415 U.S. 651, 677 (1974)).  By showing that Defendants' policies burden Plaintiffs and make voter registration more difficult for prospective voters who engage in online transactions rather than in-person transactions, Plaintiffs have established that they have been denied equal treatment and are entitled to prospective relief.  *See Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

disenfranchisement, Plaintiffs also proved an ongoing violation of their statutory right to simultaneous voter registration during online DPS transactions. ROA.3292-95. Defendants nevertheless claim that Plaintiffs identify disenfranchisement as the "only concrete harm" in this matter, and argue that, since this disenfranchisement occurred in the past, Plaintiffs cannot establish standing because the "harm had already been addressed before [the] lawsuit began:  Plaintiffs . . . were registered to vote at their new addresses when they filed this lawsuit." Br. at 19. Apart from ignoring Plaintiffs' claims of an ongoing violation, Defendants' argument also contradicts the plain language of the NVRA and well–established case law.

"Statutory construction, of course, begins with the plain language of the statute." *In re Dale*, 582 F.3d 568, 573 (5th Cir. 2009).  Section 20510(b) broadly grants a private right of action to "[a] person who is aggrieved by a violation" of the NVRA, anticipating the precise type of action here.  Defendants violated the NVRA by failing to provide each Plaintiff a voter registration application "simultaneous" with their online driver's license application. 52 U.S.C. § 20504. Plaintiffs not only suffered injury from the resulting disenfranchisement, but also by the continuing violation of their statutory right to simultaneous voter registration because of Defendants' continued refusal to bring its unlawful registration process into compliance with the NVRA. *Id*; ROA.3279-87.

Defendants' argument that Plaintiffs lack standing because the State ultimately registered them to vote has been rejected by every federal court that has considered the issue. In *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005), a foundation conducted a voter registration drive at a mall, and then mailed in the registration forms they collected. The plaintiff was already registered to vote but gave the foundation her form to notify the state of her changed address. The foundation collected numerous forms, and "mailed them in a single package to the Secretary of State's office for processing." *Id.* at 1351. That office rejected the forms because Georgia law did not allow the foundation to collect the forms (as opposed to a person authorized under Georgia's deputy registrar law). *Id.* Plaintiffs obtained an injunction prohibiting the Secretary of State from rejecting the forms.

On appeal, the State contended that the plaintiff lacked standing because she was already registered to vote, and at most had simply been denied the right to vote in her new home precinct. *Id.* at 1352. The Eleventh Circuit disagreed, holding that "[t]he Complaint alleges that the state rejected her form in violation of [plaintiff's] rights under the NVRA, which specifically protects her right to use the federal registration form to notify the state of a change of her address." *Id.* The existence of this right, of course, did not depend on whether the plaintiff was in fact registered to vote: the court emphasized that "[a] plaintiff need not have the franchise wholly

denied to suffer injury. *Id.* Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Id.*

In *Arcia v. Florida Sec'y of St.*, 772 F. 3d 1335 (11th Cir. 2015), the Eleventh Circuit reaffirmed its reasoning in *Cox* on facts analogous to those here. Two individual plaintiffs were erroneously identified as non-citizens to be removed from the voter registration rolls. *Id.* at 1341. They were not, however, ultimately prevented from voting in the 2012 primary election. The Eleventh Circuit found that they had standing to sue under the NVRA, explaining:

> Ms. Arcia and Ms. Antoine had standing to challenge Secretary Detzner's first [removal] program before the 2012 primary election because they were directly injured by it when they were wrongly identified as non-citizens. Even though they were ultimately not prevented from voting, an injury like theirs is sufficient to confer standing.

*Id.* As to a second program deployed to remove voters from the rolls before the 2012 general election, which had not yet occurred when plaintiffs filed suit, the court held that they had standing to attack it as well. This was because "[as] naturalized U.S. citizens from Nicaragua and Haiti respectively, there was a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data matching process." *Id.*

Courts have followed the Eleventh Circuit's rationale and found standing in similar circumstances. In *Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016), the plaintiffs alleged violations of NVRA's simultaneous–registration

provisions. Like the plaintiffs here, the plaintiffs in *Strach* were unable to vote in the prior election. Defendants contended, however, that since there was no showing that plaintiffs would likely not be registered in the future, standing was lacking. The court rejected this argument, holding that standing existed because each plaintiff "reside[s] in the State and may relocate within the State at sometime in the future, [and] is reasonably likely to have need of the DMV's licensing, change of address and voter registration services in the future and therefore is at substantial risk of suffering from the Defendants' non-compliance with the NVRA in the future as well." *Id.* at 615. This is, of course, the same basis on which plaintiffs have standing to seek prospective relief here. Notably, the *Strach* court based its factual finding on solely on the plaintiffs' allegations; it did not require statistical evidence that a particular plaintiff would move within the state.

Defendants gloss over the Eleventh Circuit cases in a footnote, claiming that the plaintiffs in *Cox* "remained unable to vote at the time they filed suit . . . ." Br. at 22 n.11. Not so: the individual plaintiff was an "already-registered voter." *Cox*, 408 F.3d at 1352. Defendants attempt to distinguish *Arcia* on the basis that there, the plaintiffs faced a "realistic probability" as naturalized citizens that they would be mistakenly removed from the voting rolls. But how probable was it, actually, that state authorities would repeat the very same mistake they had just made? In *Arcia*, as in *Strach*, no statistical evidence was required to support plaintiffs' allegations

because, as explained below, that is not the standard by which to establish a prospective injury sufficient to confer standing.

## B. Plaintiffs Established Standing to Seek Prospective Injunctive Relief

Because Defendants' violations of the NVRA and the Equal Protection Clause remain uncorrected, and because Plaintiffs are driver's-license holders and active voters who interact with both the State's driver's license and election regimes regularly, they have cognizable claims for prospective injunctive relief. "[A]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (internal quotations and citations omitted). Furthermore, "[w]hile the threatened future injury cannot be merely hypothetical or conjectural, probabilistic harm is enough." *Arcia*, 772 F.3d at 1341. Accordingly, plausible allegations of future injury under the NVRA confer standing for individual plaintiffs. *Strach,* 216 F.Supp.3d at 615 (driver's-license-holding plaintiffs sufficiently pled "substantial risk" of suffering from defendants' non-compliance with Section 5 in the future). Defendants' failure to correct the violation provides Plaintiffs express authority to seek declaratory and injunctive relief to fix that violation, and Plaintiffs remain "aggrieved" under the NVRA until the violation is corrected. 52 U.S.C. § 20510(b).

Here, each Plaintiff "plan[s] to continue transacting online with [DPS] in the future whenever [each is] required to renew or change the address on [his] driver's license and [each is] eligible to do so." ROA.2736-44. In fact, Texas law *requires* repeated interaction with DPS: Plaintiffs must update the address on their driver's license within 30 days after moving and must renew their driver's license every six years. TEX. TRANSP. CODE §§ 521.054, 521.271(b)(1). Moreover, as the district court found, the state allows—and in fact encourages—applicants to do so online through the combined online renewal and change-of-address application. ROA.3310.

Defendants have not rebutted this evidence. Instead, they claim that no Plaintiff has "put on evidence" of an intent to move or of becoming unregistered to vote and needing to re-register when renewing his driver's license. Br. at 21-22. In addition to ignoring the applicable legal standard—which requires no such burden of proof—Defendants' claims ignore the record before this Court.

To start, evidence of Plaintiffs' previous moves is competent evidence that they will probably move again in the future. *See, e.g., Arcia*, *supra,* 772 F.3d at 1341 (naturalized U.S. citizens who were previously incorrectly notified that they would be removed had "a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process"); *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing

on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction."). Here, Plaintiff Stringer has moved twice since 2004, and all Plaintiffs have moved once within the last five years.[6] This is not uncommon: using 2007 American Community Survey data, the United States Census Bureau estimates that a person can "expect to move 11.7 times in their lifetime."[7]

Moreover, multiple Texas statutes can trigger cancellation of voter registration outside of moving to a new home, creating a substantial likelihood that each Plaintiff will in fact have to update his voter registration in the future.[8] This,

---

[6] *See* ROA.3446-51 (sealed) (viewing the "County Vote Cast In" column); ROA.2957; ROA 1603-1605; ROA.2933; ROA.2983.

[7] Pursuant to Federal Rule of Evidence 201, Plaintiffs request this Court take judicial notice of the following U.S. Census conclusion and its underlying data: "Using 2007 ACS data, it is estimated that a person in the United States can expect to move 11.7 times in their lifetime based upon current age structure and average rates and allowing for no more than one move per single year." U.S. Dep't of Commerce, U.S. Census Bureau, Calculating Migration Expectancy Using ACS Data, *available at* https://www.census.gov/topics/population/migration/guidance/calculating-migration-expectancy.html (last visited August 30, 2018). "Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports." *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n. 4 (5th Cir. 1981) (taking judicial notice of a state statistical report); *see also Granville-Smith v. Granville-Smith*, 349 U.S. 1, 14 (1955) (taking judicial notice of information provided in a Senate report). Courts of Appeal have previously taken judicial notice of American Community Survey data reported by the U.S. Census Bureau, the precise source invoked here. *See Toj-Culpatan v. Holder*, 612 F.3d 1088, 1091 (9th Cir. 2010) (taking judicial notice of ACS data); *Skolnick v. Board of Commissioners*, 435 F.2d 361, 363 (7th Cir. 1970) (taking judicial notice of 1970 Census figures).

[8] For example, Texas law allows, among other methods, the cancellation of voter registration: (1) if after a voter's registration card is returned undeliverable, the voter does not return a confirmation notice and does not vote in two consecutive general elections., (2) by a registrar who finds the voter ineligible to vote after an investigation, (3) if another voter from the same county successfully attempts to challenge a voter's registration, or (4) if the voter himself elects to cancel his voter registration. Tex. Elec. Code §§ 16.031–16.038, 16.091–16.095.

coupled with the requirement that each Plaintiff must renew his driver's license every six years and that each Plaintiff stated that he plans to continue to renew or update his driver's license address online, ROA.2736-44, creates a sufficient probability that each Plaintiff will use the noncompliant online driver's license services again. *See Arcia*, 772 F.3d at 1341; *Strach*, 216 F.Supp.3d at 615.

Defendants' reliance on *O'Shea v. Littleton,* 414 U.S. 488 (1974), *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), and their progeny is misplaced. Those cases involved alleged constitutional violations in criminal matters where the plaintiff was unable to show a likelihood that he would again violate the law and be subject to the same unconstitutional treatment by state actors. *O'Shea,*414 U.S. at 491-92; *Lyons,* 461 U.S. at 107. In both cases, alternative remedies were available to the plaintiffs, and the Supreme Court justified its holdings in part by noting that "withholding injunctive relief does not mean that 'the federal law will exercise no deterrent effect in the circumstances.'" *Id.* at 112-13 (quoting *O'Shea*, 414 U.S. at 503).

Here, by contrast, Plaintiffs did nothing wrong, have provided evidence that they are likely to be harmed in the exact same way in the future, and have no alternative remedies. Indeed, Plaintiffs followed the State's procedures to update their driver's license addresses online and reasonably believed that doing so would also update their voter registration information. ROA.3256-58. Each will use the same online driver's license application in the future to update or renew his driver's

license, and every time he does so he—like every other qualified user of Texas's online driver's license application—will be deprived of his right to simultaneous voter registration under the NVRA, because that practice is Texas's current policy. Furthermore, as set out in more detail below, withholding injunctive relief in cases like this one would mean that the NVRA "will exercise no deterrent effect in the circumstances," *Lyons*, 461 U.S. at 112-13, since there is no alternative remedy available to the Plaintiffs, nor is there an alternative consequence to the Defendants for violating the NVRA.

Defendants' other cases are also inapposite. *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169 (5th Cir. 2018), involved a claim under the Americans with Disabilities Act. The plaintiff was a vexatious litigant who sued over 400 businesses in 300 days but apparently never returned to a single one of them, and failed to show that he intended to return to the business in question. *Id.* at 173. In *Machete Productions, LLC v. Page*, 809 F.3d 281 (5th Cir. 2015), plaintiffs lacked standing in part because they did not submit a new application to a Texas film grant program and, thus, failed to show a future injury. *Id.* at 288. Here, every Plaintiff sought to vote, each has an affirmative obligation to renew his driver's license every six years and to update his driver's license address when he moves, and each will need to update their registration with SOS when one of Texas's various relevant elections laws are

triggered. Plaintiffs also expressly intend to make future NVRA-covered transactions through the online driver's license system. ROA.2736-44.

## C. In the Alternative, the "Capable-of-Repetition-Yet-Evading-Review" Exception Applies

Even if, *arguendo*, Plaintiffs' claims were now moot, the capable-of-repetition exception to mootness applies. ROA.3282-3. The exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (rejecting mootness argument despite the passing of the election at issue). The Supreme Court and this Court have both held that the capable-of-repetition exception is particularly applicable in election law cases. *Rosario v. Rockefeller*, 410 U.S. 752, 756 n.5 (1973); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661-62 (5th Cir. 2006).

### 1. Plaintiffs Could Not Have Fully Litigated Their Claims Prior to Becoming Registered

Plaintiffs satisfy the first prong of the capable-of-repetition exception. Each Plaintiff in this case believed that he had properly updated his voter registration information by submitting a change-of address form online and indicating "Yes . . . I want to register to vote." ROA.22-40. Each Plaintiff only learned that the State failed to update his registration when he attempted to cast a ballot; thereafter, by

operation of Texas law, the provisional ballot he submitted in an attempt to exercise his franchise also registered him to vote. TEX. ELEC. CODE 65.056(a) ("If the affidavit on the envelope of a rejected provisional ballot contains the information necessary to enable the person to register to vote . . . the registrar shall treat the copy as an application for voter registration[.]"). Accordingly, Plaintiffs had no ability to bring this litigation prior to the State registering them to vote.

Defendants erroneously claim that "there is no reason to believe that other possible plaintiffs with actual live disputes (or even these same Plaintiffs if they actually were to move to a new county or become unregistered in the future) will lack sufficient time to litigate these issues." Br. at 28. But this lawsuit is proof of Plaintiffs' inability to litigate within a sufficient time. ROA.24-40. As set out above, any Texan aggrieved by the NVRA violations at issue here would be automatically registered to vote *at the very same time* they learn of those violations—that is, when they show up at the polls, learn they are not properly registered, and complete a provisional ballot that also serves as a voter registration application. *See* TEX. ELEC. CODE 65.056(a).

Under Defendants' argument, the only way a plaintiff would have standing is if he deliberately forfeited his right to vote and remained unregistered for multiple election cycles, from the date of the violation through the conclusion of the case. This cannot, of course, be the intent of Congress. It would defeat the NVRA's

purpose of "increas[ing] the number of eligible citizens who register to vote[,]" 52

U.S.C. § 20501(b)(1), and would deter those aggrieved by violations of the NVRA

from enforcing the statute as specifically provided by Section 20510(b). No person

should be required to choose between vindicating his rights under the NVRA and

exercising his separate, fundamental right to vote in the upcoming election. Such a

regime would penalize persons who detect NVRA violations and attempt to remedy

them.

Defendants also argue that "[a]ny mootness of Plaintiffs' claims was not

caused by an election, but by the fact that Plaintiffs became registered to vote[,]"

and, thus Plaintiffs' claims are a "false parallel to claims [in *Carmouche* and *Storer*]

that were mooted by an election cycle." Br. at 28; *see generally Carmouche*, 449

F.3d 655; *Storer v. Brown*, 415 U.S. 724 (1974). Defendants attempt to create a

distinction where there is none. Voter registration is directly linked to elections

because applicants register solely for the purpose of voting in upcoming elections.

*See generally* TEX. ELEC. CODE §§ 13.001–13.002. For this reason, federal courts

have repeatedly applied the capable-of-repetition exception to allow voting rights

lawsuits to proceed, even where the election has passed and plaintiffs were registered

to vote by the time the lawsuit was filed. *See, e.g.*, *Arcia*, *supra*, 772 F.3d at 1341

(noting that in election cases, "there is often not sufficient time" to resolve the

controversy before an election); *see also Rosario v. Rockefeller*, 410 U.S. at 756 &

n.5 (holding that despite the election at issue passing and plaintiffs' ability to vote in the next election, the capable-of-repetition exception applied; *Dunn v. Blumstein*, 405 U.S. 330, 330 & n.2 (1972) (holding that a voter's complaint regarding residency requirements was not moot, despite the fact that he could vote at the time of the decision, because the problem posed by the state's voting requirements was capable of repetition, but evading review).

      2.  There Is a Reasonable Expectation that Plaintiffs or Others Will Again Be Aggrieved by the State's Failure to Register or Update Their Registration During Their Next Online Driver's License Transaction

Because each Plaintiff must continue to interact with DPS to renew and update his driver's license and plans to do so online, and because Defendants refuse to provide voter registration services to Plaintiffs during these transactions, each Plaintiff is likely to suffer ongoing and future injuries. ROA.2736-2744; *see supra* Sections I (A) &(B). Even if they were not, however, similarly-situated voters will continue to face the same injury.

The *Carmouche* case is particularly illustrative here. There, this Court explained that it "does not always focus on whether a particular plaintiff is likely to incur the same injury," but asks whether other similarly-situated voters could be affected. 449 F.3d at 662 (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975); *Storer*, 415 U.S. at 737 n.8; *Dunn*, 405 U.S. at 333 n.2). The Court concluded that "even if it were doubtful that the [plaintiff] would again attempt to engage in [the

same conduct], precedent suggests that this case is not moot, because other individuals certainly will be affected by the continuing existence of the [allegedly unlawful law]." *Id.* Here, Defendants have admitted to receiving complaints from thousands of other voters who have been disenfranchised due to the policies challenged in this lawsuit. ROA.34, 158-63. As a result, "the issues properly presented" here "will persist as [Defendants' policies] are applied in future elections," preventing mootness. *Storer*, 415 U.S. at 737 n.8; *Arcia*, 772 F.3d at 1343.

## II. THE DISTRICT COURT PROPERLY HELD THAT DEFENDANTS' FAILURE TO TREAT ONLINE DPS APPLICATIONS AS VOTER REGISTRATION APPLICATIONS VIOLATES THE NVRA

The district court held that the NVRA requires DPS to integrate voter registration into its combined online driver's license renewal and change-of-address application, and that the State's practice of requiring driver's license applicants to engage in a separate and distinct transaction with another agency—SOS—to register or update their voter registration defeats the clear mandate of the NVRA. ROA.3310. On appeal, as below, Defendants read the NVRA's central tenets out of the statute. For the reasons set forth below, the Court should affirm the district court's holdings.

### A. Defendants Were on Notice of Facts Actionable Under Section 20504(a)

The district court rejected Defendants' attempt to limit Plaintiffs' challenge to change-of-address transactions, holding that because Texas chose to combine online driver's license change-of-address and renewal transactions into a single application process, and because each plaintiff attempted to update their voter registration information online while engaging in that single application process, Plaintiffs had standing to challenge Defendants' failure to allow simultaneous applications for voter registration in connection with the entire online driver's license application process. ROA.3256-58, 3259 n.10, 3288-89; *see also Ass'n of Cmty. Orgs. For Reform Now v. Miller*, 129 F.3d 833, 837 (6th Cir. 1997) (noting that while the NVRA does not prohibit states from adopting separate registration processes for federal and state elections, the NVRA will apply to registration applications that combine procedures for federal and state elections).

The only authority cited by Defendants for this argument does not compel a different result. In *Scott, supra*, 771 F.3d 831, this Court held that an individual plaintiff who failed to provide any written notice of his individual claims whatsoever did not have standing to bring suit under the NVRA. *Id.* at 835. Because only the organizational plaintiff, the NAACP, provided notice, and because that notice was too vague to allow defendants "an opportunity to attempt compliance as to [the individual plaintiff] before facing litigation," Scott had no basis for relief. *Id.* at 836 (internal quotation omitted).

Here, by contrast, each Plaintiff provided written notice that he personally attempted to update his driver's license address and voter registration information online using DPS's combined application, but that his voter registration information was not updated as a result. ROA.165 (Hernandez); ROA.322-23 (Woods); 346-47, (Stringer); *see also* ROA.3277-79. Indeed, the notice letters specified not only the circumstances of each Plaintiffs' online transactions with DPS—and their resulting inability to cast a ballot that counted in a subsequent election—but also detailed Texas's practices with respect to the online driver's license transactions, explaining how they violate the NVRA with respect to both renewal and change-of-address transactions. *See* ROA.2231-34; *see also* 2245-46, 2242-43.[9] As the district court rightly concluded, then, because Defendants use a single online system that combines driver's license renewal and change-of-address applications, and because each plaintiff attempted to update their voter registration during this single, combined transaction, Defendants were on notice of violations of both Section 20504(a) and Section 20504(d).

---

[9] Defendants' post-notice correspondence with Plaintiffs also belies their claim to have only received notice of violations related to Section 20504(d). *See, e.g.,* ROA.177-78 (arguing that Texas has chosen to opt out of online voter registration as evidenced by the fact that it only allows some applicants to renew their driver's licenses online, that Congress could not have intended Texas's choice to allow "every other time" license renewal online to "trigger statewide implementation of online voter registration[,]" and providing examples of other states that allow citizens to renew their driver's licenses online without allowing online voter registration.).

**B. DPS's Combined Online Driver's License Application Fails to Offer a Simultaneous Application for Voter Registration, in Violation of Sections 20503(a)(1) and 20504(a)**

1. The NVRA Does Not Require Physical, Handwritten Signatures on Paper

Defendants do not dispute that their online driver's license renewal and change-of-address application does not serve as a simultaneous application for voter registration as required by Section 20503 and Section 20504 of the NVRA. Instead, they claim that Texas's online driver's license applications are exempted from the NVRA's simultaneous application mandate because the State "cannot obtain an actual written signature in an online transaction[.]" Br. at 35. Defendants provide no support whatsoever for their suggestion that the NVRA requires the collection of physical, handwritten signatures on paper applications, and the district court properly rejected this claim, holding that the NVRA's simultaneous application mandate applies to *all* driver's license transactions, including those conducted online, and that nothing in Section 20504 requires Defendants to collect physical, handwritten signatures on voter registration applications. ROA.3290-92, 3302, 3308-09.

Defendants argue that this holding would impermissibly require them to "accept electronic signatures related to different documents . . . in lieu of a signature on the voter-registration application." Br. at 36. Yet this is precisely what Texas already does in order to comply with the NVRA with respect to other remote driver's

28

license transactions: those applying for changes of address by mail must state on the mail-in form whether they would like to register or update their voter registration.[10] If the applicant checks "yes," DPS then transmits, and SOS and counties use, the applicants' previously-collected electronic signature to populate the voter registration form SOS generates as a result of the DPS mail-in transaction. ROA.3260-61, 3269-70; *see also* ROA.2715-16 at n.52, ROA.2784. Indeed, for *all* voter registrations resulting from a DPS transaction—in-person and by mail—the State "accepts the electronic signatures related to different documents"—namely, driver's license application documents—to populate the voter-registration form county registrars generate  and use for voter-registration purposes. ROA.2261-63, 3261-64, 3269-70, 3308-09.

Because the plain language of the NVRA extends its simultaneous-application mandate to "each" driver's license application, Section 20504(a), the district court properly held it also requires the state to accept and use electronic signatures for all online transactions as it does for all in-person and mail transactions.

> 2. The NVRA Does Not Permit Texas to Use Separate, Non-Simultaneous Voter Registration Forms in Connection with Driver's License Transactions

---

[10] Mail-in change-of-address applications currently satisfy Section 20504(d) by asking applicants to check "Yes" or "No" beneath the questions "If you are a US citizen, would you like to register to vote? If registered, would you like to update your voter information?" ROA.2195, 2275.

The district court also correctly rejected Defendants' contention that the NVRA permits the State to use a separate, paper "voter registration application portion" for online driver's license transactions.  Br. at 36. A separate voter registration application obviously cannot be "simultaneous" with the driver's license application or change-of-address form as required by the NVRA.[11]  In fact, Congress explicitly considered and rejected such a procedure, determining that "it would not be sufficient [under the NVRA] to provide a voter registration application separate from the license application." S. Rep. No. 103-6, at 6 (1993).

For these reasons, the district court properly found that Defendants' procedure thwarts the NVRA's central requirement that voter registration applications be "simultaneous" with all driver's license renewal and change-of-address applications. The State's choice to use online applications cannot short-circuit this requirement.

### C. Defendants' Failure to Treat Online Driver's License Change-of-Address Applications as Notifications of Changes of Address for Voter Registration Violates Section 20504(d)

Defendants have never disputed that they fail to treat online driver's license change-of-address applications as notifications of address changes for voter registration, as required by the plain language of Section 20504(d). Instead, they now claim that this failure is justified by Section 20504(c)'s authorization of a

_____

[11] As set out below, Defendants' procedure also runs afoul of both the Equal Protection Clause and Section 20504(c)(2)(A), which prohibits the state from collecting duplicative information on the voter registration portion of the form.

"second signature" on the voter registration portion of *driver's license applications*, which they assert also requires a second signature on driver's license *change-of-address forms* under Section 20504(d). Br. at 36-37. Because Defendants raise this argument for the first time on appeal,[12] the Court should not consider it. *Celanese Corp. v. Martin K. Eby Constr. Co.,* 620 F.3d 529, 531 (5th Cir. 2010).

Even if this argument was not waived, it fails on the merits. Section 20504 specifies two types of driver's license forms: a "driver's license application," which includes "any renewal application," Section 20504(a)(1), and a "change of address form," Section 20504(d). Crucially, and as the district court noted, signatures are required *only* with respect to the former. ROA.3302; 52 U.S.C. §§ 20504(a), 20504(c)(2)(A), 20504(c)(2)(C). "The NVRA's change of address provision is separate, and does not state that a signature is necessary for a simultaneous driver's license-voter registration change of address." ROA.3302 (citing § 20504(d)). Instead, "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as a notification of change of address for voter registration . . . unless the registrant states on the form that the change of address is not for voter registration purposes." § 20504(d).

---

[12] Below, Defendants' argument focused on the Texas *Election* Code's requirement that updates to voter registration information be signed. ROA.2769. The district court properly rejected this argument, holding that Section 20504(d)'s "in accordance with State law for purposes of a motor vehicle driver's license" requirement means "in accordance with state driver's license laws"—in this case, the Texas *Transportation* Code. ROA.3299-3301.

An applicant who uses Texas's official online driver's license renewal and change of address application to change his driver's license address plainly does so "in accordance with State law." And while Defendants claim that "subsection (d) does not preempt any state law that would require a signature on change-of-address forms," Br. at 37, they neglect to mention that there is, in fact, no state law that contains such a signature requirement for *driver's license* change-of-address forms. ROA.3136-37. Indeed, if there were any such law, each of the millions of online driver's license change-of-address transactions completed each year would violate it.

Finally, the Court should reject Defendants' argument that allowing an applicant to "'state[] on the form' that the change of address is not for voter-registration purposes"—an option that must be given to applicants under the NVRA—"presents difficulty" for online forms compared to paper forms. Br. at 37. This argument, too, was waived by the failure to raise it below. Moreover, Defendants do not explain why they could not modify the fields on an internet application to simply allow applicants to indicate whether their address change is for voter registration purposes. The online form's failure to do so is a clear violation of

the plain language of Section 20504(d), and whatever "difficulty" exists is manufactured by Defendants' refusal to comply with the NVRA.[13]

### D. The Plain Text of the NVRA Prohibits Defendants from Collecting Duplicative Information from Online Driver's License Applicants Who Wish to Register to Vote

Defendants also argue that, should the Court conclude that Texas may require a physical signature on change-of-address applications, then Texas may also require that online driver's license applicants provide "some of the same information" on separately-mailed voter-registration forms. Defendants assert, without explanation, that any such duplicative information would "obviously be 'necessary'" to enable election officials to assess the eligibility of the applicant and administer voter registration. Br. at 38. This argument is illogical and contrary to the NVRA's language.

The NVRA's "minimum information" provision, Section 20504(c)(2)(B), is separate from, and subject to, the proscription against requiring duplicative information. Section 20504(c)(2)(A). That is, as the district court correctly held, "the minimum information necessary to verify voter registration eligibility cannot duplicate the information already provided for driver's license purposes." ROA.3296. Pursuant to the plain language of the statute, the *only* duplicative

---

[13] This also violates the Texas Election Code. TEX. ELEC. CODE § 20.062(b) (requiring that all DPS change-of-address forms allow the applicant "to indicate whether the change of address is also to be used for voter registration purposes").

information the voter registration portion of the application may require is a second signature and a statement stating each eligibility requirement, containing an attestation that the applicant meets the requirement, and requiring a signature under penalty of perjury. 52 U.S.C. §§ 20504(c)(2)(A), (c)(2)(C).

Here, the district court found that Texas requires online driver's license applicants wishing to register to vote or update their voter registration to provide SOS with several pieces of information they already provided to DPS in connection with their online transaction, including their name, address, driver's license number, date of birth, and the last four digits of their Social Security number. ROA.3297-98. None of this information is exempted from the NVRA's prohibition on duplicative information. § 20504(c)(2)(A). Accordingly, the district court's holding that Texas's current process violates the NVRA should be affirmed.

### E. Defendants Violate the NVRA's Timely Submission and Registration Requirements, §§ 20504(e) and 20507(a)(1)(A)

In addition to requiring that Defendants provide simultaneous driver's license and voter registration applications without requiring duplicative information, the NVRA mandates that DPS transmit applicants' voter registration application information to state election officials within a specified timeframe. § 20504(e). Similarly, under Section 20507(a)(1)(A), SOS must ensure that eligible applicants are registered to vote in an election if they submit a valid voter registration

application to DPS "no later than the lesser of 30 days, or the period provided by State law, before the date of the election."

It is undisputed that Defendants do neither. Accordingly, if this Court affirms the district court's holding that they violate §§ 20503(a)(1), 20504(a), 20504(c), and 20504(d), it should also affirm with respect to Defendants' failure to timely transmit and ensure the registration of the DPS applicants who indicate that they wish to register to vote or update their voter registration in the course of their online transactions.

## III. THE DISTRICT COURT PROPERLY FOUND AN EQUAL PROTECTION VIOLATION

The right to vote is a fundamental constitutional right, protected under the Equal Protection Clause from undue burden. *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 670 (1966) (describing the right to vote as "too precious, too fundamental" to be "burdened or conditioned"). The right is "protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore,* 531 U.S. 98, 104 (2000). It also "applies when a state either classifies voters in disparate ways . . . or places restrictions on the right to vote." *Obama for Am. v. Husted,* 697 F.3d 423, 428 (6th Cir. 2012).

Here, Defendants treat Texas voters who seek to register to vote through online driver's license transactions differently from those who seek to do so in person or by mail—namely, the former are not offered a meaningful opportunity to

register to vote. Defendants' disparate treatment of online users, including the Plaintiffs here, burdens the rights of millions of eligible Texas voters annually. Pursuant to well established standards laid out in scores of voting rights cases, including cases before this Court, such disparate treatment violates the Equal Protection Clause where, as here, the burdens on voting are not adequately justified by a valid state interest.

On appeal, Defendants rely on two flawed arguments they never raised below in their attempt to avoid the district court's carefully reasoned conclusion. Because these arguments were not previously raised, the Court should consider them waived.[14] Regardless, these claims also fail on their merits.

## A. The District Court Was Correct to Consider the Equal Protection Claim.

Defendants first contend that, upon ruling that Texas's conduct violated the NVRA, the district court erred in also ruling on Plaintiffs' Equal Protection claim, under the doctrine of constitutional avoidance. Defendants cite only *Veasey v. Abbott,* 830 F.3d 216 (5th Cir. 2016) (en banc), but there, this Court merely noted

---

[14] The constitutional avoidance claim discussed in Section (A) is entirely new. While Defendants previously made a passing reference to the *Anderson-Burdick* standard that governs Equal Protection claims in their reply brief, ROA.2821, that is not sufficient to preserve the issue they now raise on appeal. *Jones v. Cain,* 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived"). Defendants now seem to concede that the *Anderson-Burdick* standard applies, but they attempt to argue—for the first time—that the district court did not properly apply that standard and that the State has anti-fraud interests in the current online registration system.

that appellate courts—as opposed to district courts—are bound by this doctrine where an underlying judgment rests on alternative grounds: "[N]ormally th[is c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Id.* at 265 (quoting *Escambia Cty. v. McMillan,* 466 U.S. 48, 51 (1984)). Indeed, the district court in *Veasey* rested its decision on alternative constitutional grounds, and no part of this Court's review indicates that it was erroneous for that court to do so. *Id.* at 227-28.

Furthermore, in light of *Escambia,* "the district court should probably attempt to resolve the statutory as well as the constitutional issues." *Dotson v. City of Indianola, Miss.,* 739 F.2d 1022, 1026 (5th Cir. 1984) (Wisdom, C.J. concurring). Here, the district court's resolution of the constitutional claim was not just proper, but logical, given that Defendants hotly contested Plaintiffs' statutory NVRA claim, making appeal likely. Defendants recognize as much, conceding in their opening brief that "[i]f the Court concludes that Plaintiffs have not established an NVRA claim . . . it must consider whether Plaintiffs have proven an equal-protection claim." Br. at 29. Had the district court failed to issue a decision on the constitutional issue, and this Court reversed the district court on its NVRA decision, this Court would have been forced to remand the case for resolution of the Equal Protection claim, causing delay and unnecessary expenditure of judicial resources.

## B. Defendants' Refusal to Treat Online License Renewals and Changes-of-Address as Voter Registration Transactions Violates the Equal Protection Clause.

Defendants concede that in assessing an Equal Protection challenge to a state restriction on the right to vote, courts scrutinize the restriction using the standard established in *Anderson v. Celebrezze,* 460 U.S. 780 (1983) and *Burdick v. Takushi,* 504 U.S. 428 (1992). Br. at 29-30. Under the *Anderson-Burdick* standard, a court:

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

In *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008), the Supreme Court explained that, however slight a burden a state restriction on an individual voter may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). A sufficiently weighty justification is the difference between a reasonable and an unreasonable restriction. *Crawford* at 190 (citing *Burdick*, 504 U.S. at 434).

### 1. Defendants' Conduct Burdens Online Applicants' Voting Rights

For the first time on appeal, Defendants argue that their conduct "does not impose an unconstitutional burden on the right to vote" under the *Anderson-Burdick* standard, Br. at 30, claiming that requiring online driver's license applicants to fill out and sign an entirely separate voter-registration application is simply treating them "like everyone else," Br. at 31. This argument is wrong because Texas requires that persons using the online option—unlike those using the in-person or mail options—to take the *additional* steps of retrieving, completing, printing, and then mailing or personally delivering a written form to the proper registrar to update their voting information. ROA.3307-08, 3267-68.[15] In short, the record indisputably establishes that online applicants are in fact treated differently than "everyone else," and the additional tasks they must complete to register or update their voter registration burdens their voting rights.

Moreover, this differential treatment results in the disenfranchisement of some voters, including Plaintiffs here, which is clearly a substantial burden on their fundamental right to vote. In *Crawford,* the Supreme Court rejected a facial challenge to Indiana's photo ID law, in part because plaintiffs there did not demonstrate that any voter would be disenfranchised by the law. 553 U.S. at 187.

---

[15] Even if Defendants were correct, *Anderson-Burdick* applies to non-discriminatory restrictions that treat all voters alike. *Burdick*, 504 U.S. at 434 (applying *Anderson* to nondiscriminatory state restriction); *Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 633 (6th Cir. 2016) (applying *Anderson-Burdick* and holding that non-discriminatory restriction violated the Equal Protection Clause) (cert. denied, 137 S. Ct. 2265 (2017)).

By contrast, Plaintiffs here were burdened by the disparate treatment of online customers versus their in-person or mail-in counterparts, *and* were burdened by not being able to cast a regular ballot in an election. These burdens are restrictions on the fundamental right to vote that warrant "the demonstration of a corresponding interest sufficiently weighty to justify the limitation." Defendants have no such justification.

Finally, Defendants argue that "providing multiple options for individuals to register to vote is not a violation of the Equal Protection Clause even if Plaintiffs consider some options to be less convenient than others." Br. at 31. Defendants are wrong: once Plaintiffs have provided evidence of a burden Defendants, the *Anderson-Burdick* standard requires Defendants to justify that burden even if other "options" for registering to vote exist. *Husted*, 697 F.3d at 431-32, 436 (an early voting restriction unjustifiably burdened non-military voters even though these voters had "'ample' other means to cast their ballots").

2. Defendants' Supposed Interest in Written Signatures Is Insufficient to Justify the Burden Imposed on Voters

*Anderson-Burdick* requires that any burden on voting rights be justified by a correspondingly weighty state interest. *See Anderson,* 460 U.S. at 789. Here, Defendants attempt to justify the burden imposed on online users by asserting that Texas has a legitimate interest in requiring a handwritten signature on paper to accompany all voter registration transactions. For the first time on appeal,

Defendants argue that such written signatures are necessary to "maintain[] accurate voting rolls and combat[] fraud." Br. at 31. This argument is waived, since Defendants below claimed that their interest was "in complying with State law and the NVRA, maintaining county-based voter rolls, and allowing signatures to be compared when there is a potential problem." ROA.2821. Regardless, and as the district court found, the State's reliance on a handwritten signature to advance any interest is a red herring—belied by record evidence of the State's own practices.

Unsurprisingly then, Defendants cite nothing in the record showing how a written signature requirement furthers the interest of accuracy. In fact, as demonstrated by the Plaintiffs' experiences here, Defendants' conduct does just the opposite, ensuring that the voting rolls are inaccurate and outdated after an online applicant attempts—but is unable—to update his voter registration at the same time he updates his driver's license. Likewise, with regard to combatting voter fraud, the record contradicts Defendants' position. As the district court noted when denying Defendants' motion to dismiss, "the record in this case undercuts Defendants' claim that their heightened signature requirement for voter registration renewal transactions is necessary to their . . . signature-based voter identity verification." ROA.1569.

There are multiple reasons for this. First, again, it is undisputed that for any type of driver's license transaction—in-person or by mail—Texas does not actually

use handwritten signatures collected from driver's license applicants for voter registration or verification purposes. Instead, the DPS collects, and SOS and the counties use, *electronic* signatures of voters. ROA.2269-73; *see also* TEX. ELEC. CODE § 20.066(a)(2) ("the applicant's electronic signature provided to [DPS] will be used for submitting the applicant's voter registration application"); *id.* at § 20.066(b) ("[DPS] shall electronically transfer the applicant's voter registration data, including the applicant's signature, to the secretary of state").

Second, as noted by the district court, nothing in Texas law defines "signature" to mean a physical, handwritten signature on a piece of paper. ROA.3302-04. Instead, various provisions of Texas law explicitly state that *electronic* signatures are either necessary or sufficient. *Id.* For instance, Texas law provides that state agencies may accept electronic signatures, TEX. BUS. & COM. CODE § 322.017(a), and "[i]f a law requires a signature, an electronic signature satisfies the law." *Id.* at § 322.007(d). "A digital signature may be used to authenticate a written electronic communication sent to a state agency," and authentication of an individual's identity using DPS data—as is done for all applicants using DPS's online driver's license application—may be used by a state agency as an alternative to requiring "an original signature on a document." TEX. GOV'T CODE §§ 2054.060(a), 2054.271(b); *see also* ROA.2197 at n.24. And not only does Texas law require that SOS use DPS applicants' electronic signatures for

voter registration, TEX. ELEC. CODE §§ 20.066(a)(2)-(3), but a voter's electronic signature may also be used on official signature rosters at the polls as well. 1 TEX. ADMIN. CODE § 81.58. The fact that Texas already uses electronic signatures for all of these functions is further confirms their sufficiency for voter registration purposes for online driver's license applicants.

It follows that Defendants did not, and cannot now, show why their written signatures are necessary to prevent voter registration fraud. Again, it is undisputed that Texas already uses electronic signatures for important functions, including voter registration and verification, and, as stated in *Anderson*, "[i]f the [s]tate has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Anderson, supra,* 460 U.S. at 806 (quoting *Kusper v. Pontikes,* 414 U.S. 51, 59 (1973)). Similarly, in *Northeast Ohio Coalition for the Homeless v. Husted,* 837 F.3d 612 (6th Cir. 2016), the court explained that a restriction purportedly imposed to combat voter fraud was unjustified, in part, because the state already had a policy in place that was sufficient to prevent voter fraud. *Id.* at 633.

Finally, although combatting voter fraud is a legitimate state interest, "some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh." *Id.* at 632. Defendants provide no specificity as to how or why the written signature requirement serves to combat voter fraud, particularly in light

of their acceptance and use of electronic signatures for voter registration and verification purposes. Defendants therefore do not show, as required by the *Anderson-Burdick* standard, a sufficient justification for the burden imposed on some 1.5 million Texans who go online to renew their licenses or change their address. The district court's finding of an Equal Protection violation should be affirmed.

IV. **THE INJUNCTION IS APPROPRIATE IN SCOPE TO REMEDY DEFENDANTS' NVRA AND EQUAL PROTECTION VIOLATIONS, TO CURE THEIR EFFECTS, AND TO ENSURE COMPLIANCE.**

Contrary to Defendants' assertions, the district court's injunction did not go "beyond what is warranted in this case." Br. at 41. The injunction is based on substantial evidence in the record that Defendants: (1) violated multiple provisions of the NVRA and the Equal Protection Clause, (2) caused and continue to cause widespread voter confusion through these on-going violations, (3) disenfranchised the Plaintiffs in the past, (4) continue their refusal to comply with the NVRA after receiving notice of the violations, (5) are likely to repeat the injury to Plaintiffs, and (6) have repeatedly violated the rules of procedure and orders of the court in this case, previously requiring sanctions to force compliance. The district court's injunction is precisely calibrated and narrowly tailored to correct this unlawful behavior, cure its effects, and ensure that Defendants comply with the court's injunction.

Defendants' objections to the scope of the injunction should also be viewed in light of their refusal to comply with the district court's order to submit their own proposed form of judgment. Defendants advance these objections in this Court only after they purposefully ignored the district court's order to provide it with guidance as to the form of an injunction they would find appropriate. ROA.3312-13, 3324-33, 3345.

## A. The District Court Has Broad Discretion in Crafting Appropriate Injunctive Relief.

"[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). In crafting such remedies, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Such relief may impose burdens on the Defendants if such burdens are necessary to provide "complete relief" to the aggrieved parties. *Lion Health Servs. Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011). Such "complete relief" may incidentally impact and benefit third parties or the public as a whole. *Professional Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty Cmty. Coll. Dist.*, 730 F.2d 258, 273–74 (5th Cir. 1984) ("An injunction, however, is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—

if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

When shaping a remedy for an Equal Protection Clause violation, "the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class. How equality is accomplished is a matter on which the Constitution is silent." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1698 (2017) (internal quotations and citations omitted). Federal courts have regularly ordered additional remedial measures to correct past and future Equal Protection violations. In *Swann,* for example, the Supreme Court held that specific and comprehensive remedial measures imposed by the district court were within that court's remedial power to address school segregation and that "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." 402 U.S. at 14–16.

To constitute an abuse of discretion, the district court's order must be shown to "exceed the legal basis of the lawsuit" in that it is not "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *Scott*, *supra,* 826 F.3d at 214; *see also* FED. R. CIV. P. 65. "[A] remedy is narrowly tailored if it targets and

eliminates no more than the exact source of the 'evil' it seeks to remedy." *Chabad-Lubavitch of Georgia v. Miller*, 5 F.3d 1383, 1395 (11th Cir. 1993) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-10 (1984)) (internal quotations omitted). Accordingly, to the extent a district court finds that enjoining an unlawful act alone will not provide complete relief to the aggrieved parties, a "narrowly tailored" remedy is one that also addresses these "evils" through additional orders.

**B. The Injunction is Narrowly Tailored to Remedy Defendants' Unlawful Conduct and to Ensure Future Compliance**

1. The Injunction Includes Only Provisions Necessary to Provide "Complete Relief" to the Plaintiffs

The district court exercised its discretion to require remedial measures necessary to provide "complete relief" to the Plaintiffs and to ensure compliance with specific aspects of the NVRA and the Equal Protection Clause. *See* 52 U.S.C. §§ 20504(c)(1); 20503(a)(1); 20504(a), (c), (d), & (e). As set out in greater detail below, each of the injunction's mandates are supported by detailed findings that the Defendants have violated and continue to violate the NVRA and the Equal Protection Clause in a manner that has caused widespread confusion among eligible voters, including the Plaintiffs. ROA.3352, 3251-3311. Accordingly, each and every provision of the Court's injunction is aimed at remedying the conduct made the basis of this suit.

Defendants cite *Voting Rights Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) and *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 794–95 (7th Cir. 1995) for the proposition that the court below failed to display an "adequate sensitivity to the principle of federalism." Br. at 40. These cases are distinguishable, and actually confirm the district court's authority to impose detailed remedial measures in egregious cases of NVRA noncompliance.

In *Edgar*, the Seventh Circuit explained that there was no reason to believe that the State of Illinois would not comply with the district court's injunction after the Seventh Circuit held that the NVRA was, in fact, constitutional. 56 F.3d at 798. The constitutionality of the newly-passed NVRA was then in dispute, and the state had not been shown to refuse compliance except on the basis of the Court's pending ruling on the wholesale enforceability of the Act. The court held that there was no need to impose a detailed injunction with specific measures for implementation when the district court could enter a simple order that the NVRA was enforceable and that the state must comply with its terms. *Id*. The *Edgar* court noted that "until it appears that the state will not comply with such an injunction, there is no occasion for the entry of a complicated decree that treats the state as an outlaw and requires it to do even more than the 'motor voter' law requires." *Id*. *Edgar* thus simply confirms that a state can and should be required to take additional measures when it has willfully failed to comply with the NVRA, as Defendants have, and indeed can

be required "to do even more" to remedy those violations and prove its ongoing compliance. *See id.* And as Defendants themselves point out, the Seventh Circuit held that even for "functions that the Constitution assigns to state and local government," "protracted federal judicial supervision" is justified in "extreme cases of demonstrated noncompliance." The district court found this to be just such a case.

In *Wilson*, the Ninth Circuit considered whether California's ability to control its own *state* elections might limit enforceability of the NVRA in future litigation. *Wilson*, 60 F.3d at 1416. The district court had not actually entered any orders as to implementation, but rather had simply entered an injunction requiring compliance with the NVRA because it was constitutional. *Id.* at 1412-13. The court therefore was not focused on whether particular orders necessary to redress purposeful violations of the NVRA were appropriate, but rather merely commented on the need to apply the NVRA only in the context of federal elections, rather than state elections. State elections are not, however, at issue in this case, and there is no claim that the district court's injunction would improperly burden Texas's "power to conduct its state elections as it sees fit." *Wilson*, 60 F.3d at 1416.

Neither *Edgar* nor *Wilson*, therefore, stands for limiting the district court's power to fashion an appropriate equitable remedy, including detailed orders and remedial measures, when a state has repeatedly violated the NVRA and thus caused widespread voter confusion.

2. The District Court Was Empowered to Order Remedial Measures Necessary to Fully Remedy Violations of the NVRA and Equal Protection Clause

Defendants contend that the district court abused its discretion by mandating (1) a public education campaign to remedy past and future voter confusion, (2) specific language that the State must use in compliance with the court's injunction, (3) monitoring and reporting of the State's compliance efforts, and (4) retention of jurisdiction over enforcement actions stemming from the injunction. But all of these mandates are supported by the court's detailed legal and factual findings that the State has violated, and continues to violate, the NVRA and the Equal Protection Clause by failing to provide for simultaneous voter registration application with online driver's license renewal and change-of-address transactions, thereby causing actual confusion among eligible voters including the Plaintiffs. ROA.3352; 3251-3311. The scope of the violation, and therefore the possible equitable remedy, is defined by the NVRA itself, and an equitable remedy fashioned to address these particular violations is appropriate in scope. *See* 52 U.S.C. §§ 20504(c)(1); 20503(a)(1); 20504(a), (c), (d), and (e). Even assuming *arguendo* that particular provision of the injunction is found to exceed the court's authority, the provisions are severable, and the injunction should be affirmed but for that particular provision.

*a. Public Education Campaign*

Defendants' willful violation of the NVRA has caused actual confusion among eligible voters. *See* ROA. 24, 1559, 1667, 3010, 3257-58, 3267, 3292. The State's failure to inform Plaintiffs and the public about its compliance with the NVRA after the injunction will continue to mislead them, especially in light of Defendants' 2016 changes to the DPS website which added a notice in red font indicating that the DPS online application would not serve as a voter registration application. *See* Br. at 8-9 & n.4; ROA.2365. The substantial change to the DPS website made necessary by Defendants ongoing violations justifies ordering additional steps by Defendants to remedy the effects of those violations.

Moreover, voter education campaigns have been fashioned in other voting rights cases where actual confusion was likely. *See Veasey v. Abbott*, No. 2:13-CV-00193, at Dkt No. 895 (S.D. Tex. Aug. 10, 2016) (order) (though the State was required to educate the public about its Voter ID law by statute, the court ordered the State of Texas to "develop a detailed voter education plan" and oversaw both its proposed plan, including very specific implementation procedures, and its compliance with that plan); *id*. at Dkt. No. 898 (party filing) (outlining Texas's voter education plan including television, print, and digital media).

The injunction here case is narrowly tailored to correct Defendants' past and present actions that are causing voter confusion, and does not unreasonably burden

the Defendants, who have implemented similar programs in the past and can comply at minimal expense.

### b. Specific Compliance Language

Requiring Defendants to use specific language in their online driver's license renewal and change-of-address application is necessary to ensure their compliance with the NVRA. The language the district court required Defendants to adopt is consistent with Defendants' obligations under the NVRA. *See* 52 U.S.C. §§ 20504(a), (d). Accordingly, Defendants could not comply with the NVRA without adopting language substantially similar to that mandated by the court, and any attempt to exercise their "discretion" in deviating from this language would likely result in additional NVRA violations and additional voter confusion. The court's order is intended to prevent any ambiguity in the requirements for compliance and to prevent further litigation.

### c. Compliance Monitoring and Retained Jurisdiction

The Middle District of Louisiana has explained that compliance monitoring is often appropriate in NVRA cases, and that this is a common remedial measure:

> [w]here a state or its subordinate agencies openly and plainly refuses to comply with the NVRA, such monitoring may be proper. Indeed, other plaintiffs have requested it, and other courts have recognized this particular[] remedy['s] special value to securing the NVRA's aims. Historically, when NVRA violations have been suitably proven, as they have been here, courts have not hesitated to compel states to submit plans for full and prompt compliance.

*United States v. Louisiana,* 196 F. Supp. 3d 612, 676 (M.D. La. 2016) (vacated by settlement) (internal citations omitted).  So too here.  Given the State's track record of refusal to comply with both the NVRA and the district court's orders, the district court was justified in ordering monitoring to ensure Defendants bring themselves into compliance.  ROA.1540-44 (explaining why the district court was forced to impose sanctions for Defendants' "willful disregard" for the court's orders, specifically, that their conduct was "disruptive, time consuming, cost consuming, and prejudicial"), 3312-13 (explaining Defendants' refusal to comply with the court's order to submit a proposed form of judgment), 3310 (concluding that Defendants have refused to comply with the NVRA after appropriate demand).

Finally, the district court's decision to retain jurisdiction over enforcement actions is appropriate given the Defendants' refusal to comply with the NVRA, and the significant time already expended by the court in determining the scope of the violations and the appropriate equitable remedies.  Pursuant to its inherent power, the district court is empowered to retain jurisdiction where doing so "enables a court to manage its proceedings, vindicate its authority, and effectuate its decrees." *SmallBizPros, Inc. v. MacDonald*, 618 F.3d 458, 461–62 (5th Cir. 2010) (internal quotations omitted).  When, as here, an ongoing violation exists, and when circumstances indicate that compliance monitoring is necessary, the district court

has not abused its discretion in retaining jurisdiction to vindicate its authority and effectuate its decrees should an enforcement action become necessary.

## CONCLUSION

Plaintiffs respectfully request that the Court enter an Order affirming the judgment and injunction granted by the district court, and immediately remand so that the district court may enter a new compliance schedule.

Respectfully submitted,

By: /s/ Charles S. Siegel
Peter A. Kraus
Texas Bar No. 11712980
kraus@waterskraus.com
Charles S. Siegel
Texas Bar No. 18341875
siegel@waterskraus.com
Caitlyn E. Silhan
Texas Bar No. 24072879
csilhan@waterskraus.com
Rachel A. Gross
rgross@waterskraus.com

WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-871-2263 (Facsimile)

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381

beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

***ATTORNEYS FOR PLAINTIFFS-
APPELLEES***

**CERTIFICATE OF SERVICE**

On August 31, 2018, the foregoing *Brief of Plaintiffs-Appellees Jarrod Stringer, Benjamin Hernandez, and John Woods* was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned and is free of viruses.

/s/ Charles S. Siegel
Charles S. Siegel

**CERTIFICATE OF COMPLIANCE**

Pursuant to FED. R. APP. P. 32(a)(7)(B), undersigned counsel certifies that this brief complies with the type-volume limitations contained therein, and states that exclusive of the portions exempted by FED. R. APP. P. 32(f), this brief contains 12,896 words. Undersigned counsel further certifies that, pursuant to FED. R. APP. P. 32(a)(5)(A) and (6), this brief is printed in a proportionally-spaced, serif typeface using Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes produced by Microsoft Word software.

/s/ Charles S. Siegel
Charles S. Siegel