# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2019

Lyle W. Cayce
Clerk

No. 18-50428

JARROD STRINGER; BENJAMIN HERNANDEZ; JOHN WOODS,

        Plaintiffs–Appellees,

v.

DAVID WHITLEY, in His Official Capacity as the Texas Secretary of State;
STEVEN C. MCCRAW, in His Official Capacity as the Director of the Texas
Department of Public Safety,

        Defendants–Appellants.

———————

Appeal from the United States District Court
for the Western District of Texas

———————

Before OWEN, Chief Judge, and CLEMENT and HO, Circuit Judges.

PRISCILLA R. OWEN, Chief Judge:

        Texas's Secretary of State and Director of Public Safety appeal a district court judgment declaring them in violation of the Equal Protection Clause and the National Voter Registration Act of 1993 and granting injunctive relief. We reverse the judgment because Plaintiffs do not have standing to pursue their claims.

## I

        Those who seek to renew their driver's license in Texas or to change the address associated with their driver's license can submit paper applications or

apply online using the Texas Department of Public Safety's (DPS) online system (DPS System). Paper applications ask the following voter registration questions: "If you are a US Citizen, would you like to register to vote? If registered, would you like to update your voter information?" Applicants answer by checking a box for "yes" or "no." DPS transfers the information provided by each applicant who answers "yes" to the Texas Secretary of State (the Secretary). The Secretary sends the applicant's information to local voter registrars, who use the data to complete the voter registration process.

Those using the online DPS System to renew their driver's license or to change the address associated with their driver's license are asked a different voter registration question: "Do you want to request a voter application? You will receive a link to a voter application on your receipt page." The DPS System receipt page states, "You are not registered to vote until you have filled out the online application, printed it, and mailed it to your local County Voter Registrar. Click here to Download a Voter Registration Application." DPS System users can access a voter registration application through the link on the receipt page. DPS does not send the Secretary the information provided by applicants who answer "yes" to the DPS System's voter registration question.

Plaintiffs Jarrod Stringer, Benjamin Hernandez, and John Woods each moved from a Texas county in which they were registered to vote to another Texas county between 2013 and 2015. Plaintiffs used the DPS System to change their driver's license addresses and selected "yes" in response to the voter registration question. Plaintiffs believed that they had updated their voter registration by doing so. Stringer and Hernandez discovered that they were not registered to vote in their new counties when they unsuccessfully attempted to vote in the 2014 federal election. Woods was informed that he was not registered to vote in his new county when he called a county authority

to confirm his polling location for the 2015 election. Woods and Hernandez submitted provisional ballots, which ultimately were not counted. All three plaintiffs were registered to vote in their new counties by the end of 2015.

Plaintiffs sued the Texas Secretary of State and the Director of the Texas Department of Public Safety, alleging that the DPS System violates the Equal Protection Clause and the National Voter Registration Act of 1993 (NVRA). Plaintiffs alleged that the DPS System violates a number of NVRA provisions, including 52 U.S.C. § 20504(d), which states "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration."[1] Plaintiffs sought declaratory and injunctive relief, not damages.

Plaintiffs filed a motion for summary judgment. Texas filed a cross-motion for summary judgment, contending, *inter alia*, that Plaintiffs do not have standing to bring their claims. The district court granted summary judgment to Plaintiffs, holding that Plaintiffs have standing to bring their claims and that the DPS System violates the NVRA and the Equal Protection Clause.[2] The district court entered a final judgment granting Plaintiffs wide-ranging declaratory and injunctive relief. Texas appeals.

## II

We review questions of standing de novo.[3] To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief.[4] Courts have divided this rule into three components: injury in fact,

---

[1] 52 U.S.C. § 20504(d).
[2] *Stringer v. Pablos*, 320 F. Supp. 3d 862 (W.D. Tex. 2018).
[3] *Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006).
[4] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

causation, and redressability.[5]  The party seeking to invoke federal jurisdiction, in this case the Plaintiffs, bears the burden of establishing all three elements.[6]

Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements.  The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries.[7]  Because injunctive and declaratory relief "cannot conceivably remedy any past wrong,"[8] plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury.[9]  That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact.[10]  To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else;[11] (2) "concrete and particularized,"[12] not abstract;[13] and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'"[14]  The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too

---

[5] *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) (referencing "the now-familiar elements of injury in fact, causation, and redressability").

[6] *Lance*, 549 U.S. at 439; *Lujan*, 504 U.S. at 561.

[7] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976)).

[8] *Id.* at 108.

[9] *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (stating that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers[,]" not whether he had previously been injured by the use of a chokehold).

[10] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

[11] *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).

[12] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[13] *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("The abstract nature of the harm . . . prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion.").

[14] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560).

speculative for Article III purposes."[15]  For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.[16]

The district court did not apply this standard.  The district court held that Plaintiffs had standing because they were "deprived of their individual right to simultaneous voter registration applications at the time they engaged in the online DPS transactions to change their driver's licenses," and "[c]ourt-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others."[17]  The injury identified by the district court—the "depriv[ation] of [Plaintiffs'] individual right to simultaneous voter registration applications *at the time they engaged in the online DPS transactions*"[18]—was not a continuing or threatened future injury, but a past injury.  To the extent that the district court identified a continuing or threatened future injury, it did so when it stated that "[c]ourt-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others."[19]  However, whether compliance with the NVRA would prevent future injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves.[20]  Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past.

---

[15] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 564 n.2).

[16] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

[17] *Stringer v. Pablos*, 320 F. Supp. 3d 862, 883 (W.D. Tex. 2018).

[18] *Id.* (emphasis added).

[19] *Id.*

[20] *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).

Plaintiffs must also show that there is a substantial risk that they will suffer the potential future injury absent their requested relief.[21]  The district court did not address the probability of Plaintiffs being injured in the future absent their requested relief.

## A

Plaintiffs contend that they have demonstrated a substantial risk that they will suffer a future injury as a result of the DPS System's noncompliance with the NVRA and Equal Protection Clause.  As Plaintiffs concede, to do so, they must demonstrate "a sufficient probability that each Plaintiff will use the noncompliant driver's license services again."  All three Plaintiffs declared that they "plan to continue transacting online with [DPS] in the future whenever [they are] required to renew or change the address on [their] driver's license and [are] eligible to do so."  However, each Plaintiff will have the occasion to use the DPS System to update his voter registration only if (1) he moves within Texas, in which case he might wish use the DPS System to change his address on file with DPS and his county voter registrar, or (2) he becomes both unregistered to vote and eligible to renew his driver's license using the DPS System, in which case he might wish to use the DPS System to renew his driver's license and register to vote.

Plaintiffs rely on two types of evidence that they contend demonstrate a substantial risk that they will move again.  The first is evidence of their prior moves—Hernandez and Woods have each moved once in the past five years, and Stringer has moved several times.  However, evidence that a plaintiff has taken an action in the past does not, by itself, demonstrate a substantial risk that the plaintiff will take the action in the future; there must be some evidence

---

[21] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

that the plaintiff intends to take the action again.[22] Accordingly, evidence that Plaintiffs moved in the past does not establish a substantial risk that they will do so in the future. Notably, no Plaintiff has expressed any intention to move in the future.

The second type of evidence cited by Plaintiffs is data from the United States Census Bureau showing that Americans can expect to move 11.7 times in their lifetimes.[23] This general data also does not establish a substantial risk that Plaintiffs themselves will move again; Plaintiff-specific evidence is needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans.[24]

Plaintiffs also have not demonstrated a substantial risk that they will attempt to use the DPS System to renew their driver's licenses and simultaneously update their voter registrations. Plaintiffs contend that Texas's requirement that driver's licenses must be renewed every six years and the existence of Texas laws providing multiple avenues for the cancellation of a voter's registration create a "sufficient probability" that, at some point in the future, Plaintiffs will be both unregistered to vote and eligible to renew their driver's licenses using the DPS System. However, Plaintiffs do not point to

---

[22] *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 174 (5th Cir. 2018) (holding that a disabled person did not have standing to bring an action seeking injunctive relief against a defendant hair salon that he had visited once before absent evidence that he intended to return to the salon); *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (holding that a production company that had been denied a permit to produce the second installment in a film series did not have standing to seek an injunction because it failed to show any concrete or imminent plans to produce another film in the franchise).

[23] The court takes judicial notice of UNITED STATES CENSUS BUREAU, CALCULATING MIGRATION EXPECTANCY USING ACS DATA (2018), https://www.census.gov/topics/population/migration/guidance/calculating-migration-expectancy.html. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

[24] *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) ("We have repeatedly held that such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing.").

any Plaintiff-specific evidence suggesting that they will become unregistered and eligible to renew their driver's licenses using the DPS System.

In light of the absence of any Plaintiff-specific evidence, the evidence in the record does not demonstrate a substantial risk that Plaintiffs will become unregistered and eligible to renew their driver's licenses online. Plaintiffs cite Texas laws that provide for the cancellation of voter registration in four relatively uncommon situations: (1) when a voter's registration card is returned as undeliverable, the voter does not return a confirmation notice, and the voter does not vote in two consecutive general elections; (2) when a registrar finds a voter to be ineligible after an investigation; (3) when another voter from the same county successfully challenges a voter's registration; and (4) when a voter cancels his or her voter registration.[25] There is no evidence in the record that suggests that any Plaintiff is likely to fall within the ambit of these provisions. Furthermore, Texans are only required to renew their driver's licenses every eight years,[26] and every other renewal must be accomplished in person.[27] Chances are slim that Plaintiffs will become unregistered around the time that they need to renew their driver's licenses and are eligible to do so using the DPS System.

In sum, Plaintiffs have not established a substantial risk that they will attempt to update their voter registrations using the DPS System and be injured by their inability to do so. As a result, Plaintiffs have not established

---

[25] TEX. ELEC. CODE ANN. §§ 16.031-16.038, 16.091-16.095 (West 2010 and West Supp. 2017).

[26] Act of June 10, 2019, 86th Leg., R.S., ch. 595, § 7.001, 2019 Tex. Sess. Law Serv. 1726 (West) (codified at TEX. TRANSP. CODE ANN. § 521.271(a)(1)).

[27] 37 TEX. ADMIN. CODE § 15.59(c) (2018) (Tex. Dep't of Pub. Safety, Alternative Methods for Driver License Transactions).

an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that they seek.[28]

## B

Plaintiffs contend that two Eleventh Circuit cases support the opposite conclusion. The first, *Charles H. Wesley Education Foundation, Inc. v. Cox*,[29] is distinguishable. *Cox* involved a charity that collected and submitted voter registration forms in Georgia.[30] Georgia rejected the forms submitted by the charity on state law grounds, including a form submitted on behalf of plaintiff Crawford, a registered voter who was attempting to change her address.[31] At the time the suit was filed, Georgia had not accepted the forms at issue.[32] Accordingly, Crawford had standing to sue for an injunction requiring Georgia to accept her form because doing so would remedy her alleged injury—the violation of her right under the NVRA to have her form accepted and her address changed.[33] In this case, on the other hand, Plaintiffs are not seeking an injunction requiring Texas to accept any form that they have previously submitted or to take any action regarding their individual registrations.

The second case, *Arcia v. Florida Secretary of State*,[34] also does not help Plaintiffs. *Arcia* arose out of two Florida programs designed to remove ineligible voters from the voter rolls.[35] The first identified possible non-citizens using state records.[36] The plaintiffs were identified as non-citizen candidates

---

[28] *See Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (holding that Lyons did not have standing to seek injunctive relief because "it is surely no more than speculation to assert . . . that Lyons . . . will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury").

[29] 408 F.3d 1349 (11th Cir. 2005).

[30] *Id.* at 1351.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 1352 n.3.

[34] 772 F.3d 1335 (11th Cir. 2014).

[35] *Id.* at 1339.

[36] *Id.*

for removal by the first program, but ultimately were not removed.[37] The second program identified candidates for removal using the federal "SAVE" database.[38] The Eleventh Circuit held that the plaintiffs had standing to "prospectively challenge" the second removal program because the evidence in the record demonstrated "a realistic probability that they would be misidentified due to unintentional mistakes."[39] Whether the evidence in the *Arcia* record demonstrated a "realistic possibility" that the *Arcia* plaintiffs would suffer a threatened future injury does not have any impact on whether the facts in this record demonstrate a "substantial risk" that Plaintiffs will suffer a threatened future injury. *Cox* and *Arcia* do not support the conclusion that Plaintiffs have standing.

## C

Plaintiffs also contend that they have standing because their claims are capable of repetition, yet evading review. The capable-of-repetition-yet-evading-review doctrine is an exception to the general rule that federal courts do not have jurisdiction over moot cases.[40] A case becomes moot when "[t]he requisite personal interest that must exist at the commencement of the litigation"[41] ceases to exist because "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[42] The capable-of-repetition-yet-evading-review doctrine applies only to claims that are moot, *i.e.* presented a case or controversy when they were filed but ceased to do so at

---

[37] *Id.*

[38] *Id.*

[39] *Id.* at 1341.

[40] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

[41] *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999) (citing *Arizonans For Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)).

[42] *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

a later time.[43] "Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."[44] Because Plaintiffs became registered *prior* to bringing this lawsuit, the fact that Plaintiffs were registered impacts whether they have standing to sue, not whether their claims are moot.[45] Accordingly, the capable-of-repetition-yet-evading-review doctrine is not implicated by Plaintiffs' claims.[46]

\* \* \*

Because Plaintiffs do not have standing, we REVERSE the judgment of the district court, VACATE the district court's injunction, and REMAND to the district court with instructions to dismiss Plaintiffs' claims for lack of standing.

---

[43] *Renne v. Geary*, 501 U.S. 312, 320 (1991) ("While the mootness exception for disputes capable of repetition yet evading review has been applied in the election context, that doctrine will not revive a dispute which became moot before the action commenced." (citation omitted)).

[44] *Laidlaw*, 528 U.S. at 191.

[45] *Renne*, 501 U.S. at 320.

[46] *Laidlaw*, 528 U.S. at 191.

JAMES C. HO, Circuit Judge, concurring:

The Chief Justice once wrote: "[T]hose who govern should be the *last* people to help decide who *should* govern." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality op.). This sentiment is deeply engrained in our nation's DNA. As Americans, we have never trusted the fox to guard the henhouse.

In *McCutcheon*, the Chief applied this skepticism in the context of campaign finance regulation. In sum, regulators say: I want to keep big money out of politics. And fair enough. Money can certainly corrupt. But money can also support speech. *See id.* at 191–92; *see also Buckley v. Valeo*, 424 U.S. 1, 288 (1976) (Marshall, J., concurring in part and dissenting in part) ("[A]ll Members of the Court agree . . . money is essential for effective communication in a political campaign."). Bribery is prohibited. But speech is protected. And in our legal system, we presume innocence—not corruption. So when regulators regulate too far, citizens may fear that the *real* purpose is to reduce speech.[1]

The case before us today involves voting, not speech. But that raises the question: Should the Chief's sentiments apply here as well? After all, citizens exercise "the right to participate in electing our political leaders . . . in a variety of ways"—they can "urge others to vote" by engaging in and funding political speech, but of course they can also "vote" themselves. *McCutcheon*, 572 U.S.

---

[1] For example, it's widely said that there's "little sense" in restricting campaign contributions unless we also restrict independent expenditures—either act can corrupt, so it's pointless to restrict one if you don't also restrict the other. *Buckley*, 424 U.S. at 261 (White, J., concurring in part and dissenting in part). *See also id.* at 290 (Blackmun, J., concurring in part and dissenting in part) (same); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 518–521 (1985) (Marshall, J., dissenting) (same); *Randall v. Sorrell*, 548 U.S. 230, 276 (2006) (Stevens, J., dissenting) (same); *Zimmerman v. City of Austin*, 888 F.3d 163, 169 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc) (same). Yet "[w]ell-established precedent makes clear that the expenditure limits violate the First Amendment." *Randall*, 548 U.S. at 236 (plurality op. of Breyer, J.). So if there's "little sense" in regulating contributions alone, citizens may worry that the *real* target is not corruption, but speech.

at 191. So wouldn't it be natural for citizens to harbor the same concerns here—that political interest will triumph over public spirit, whether intentionally or subconsciously, whenever public officials regulate *any* aspect of how we choose public officials? Whether it's regulating how citizens may vote, or how citizens may urge others to vote, shouldn't citizens insist that we need not simply trust—we must also verify?

One potential difference is that, when it comes to administering elections, *someone* obviously has to set ground rules to ensure the security and integrity of the ballot box. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (recognizing "the State's interest in protecting the integrity and reliability of the electoral process"). The Constitution expressly authorizes states to regulate elections. *See* U.S. Const. art. I, § 4 ("The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators."). And so "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotations omitted).

But surely that does not mean citizens must ignore entirely the Chief Justice's admonitions, and blindly trust that regulators never miss their marks. At a minimum, citizens can verify that regulations are lawful and do not infringe on the right to vote.

In this case, Plaintiffs allege that the State of Texas violates voting rights in various ways. For example, the National Voter Registration Act of 1993 (also known as the Motor Voter Act) requires, *inter alia*, that "[a]ny

change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration." 52 U.S.C. § 20504(d).

On the plain text of the statute, the rule seems simple enough: If it's good enough for motorist licensing, then it ought to be good enough for voter registration. If the system is secure enough to ensure the integrity of the former, then it ought to be secure enough to ensure the integrity of the latter.

Plaintiffs contend that the State of Texas violates this rule. For example, Jarrod Stringer and Benjamin Hernandez alleged, and a respected district judge found, that they each submitted an address change for their driver's licenses—but were nevertheless unable to vote in their new locations during the 2014 federal election cycle.

The State responds, *inter alia*, that Congress enacted the National Voter Registration Act in 1993—well before the age of the Internet, the advent of online transactions and electronic signatures, and the bevy of security questions that cyber-activities inevitably present.

I agree with my colleagues that we are not at liberty to decide the merits in this case, because none of these Plaintiffs have standing to seek injunctive relief here. They all secured their right to vote by the 2016 election cycle. And they claim no future injury that we can redress today. I therefore join Judge Owen's opinion in full, reversing the judgment of the district court due to Plaintiffs' lack of standing.

But although we have no occasion to decide the merits of Plaintiffs' claims due to their lack of a future injury, that does not prevent us from acknowledging that Plaintiffs have indeed endured an injury in the past. They were unable to exercise their right to vote in past election cycles. And it is a right they will *never* be able to recover. As citizens, we can hope it is a

deprivation they will not experience again—even if the law does not afford them a remedy from this court at this time.

I concur.